# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF ARKANSAS
### LITTLE ROCK DIVISION

THE UNITED STATES OF AMERICA, )
*ex rel.* NORMAN RILLE and NEAL )
ROBERTS, )
                )
        Plaintiff, )
                )
        vs. )
                )
PRICEWATERHOUSECOOPERS, LLP, )
a Delaware Limited Liability Partnership; )
PWC CONSULTING LLC, a Delaware )
Limited Liability Company; INTERNA- )
TIONAL BUSINESS MACHINES, )
INC., a New York corporation, )
IBM GLOBAL SERVICES COMPANY, )
a New York corporation, a wholly- )
owned subsidiary of INTERNATIONAL )
BUSINESS MACHINES, INC.; )
ORACLE CORPORATION, a Delaware )
corporation; THE BOEING COMPANY, )
a Delaware corporation; LOCKHEED )
MARTIN CORPORATION, a Maryland )
corporation; RAYTHEON COMPANY, a )
Delaware corporation; EXOSTAR, LLC, )
a Delaware Limited Liability Company; )
and EXOSTAR CORPORATION, )
a Delaware corporation, and CISCO )
SYSTEMS, INC., a California corporation, )
                )
        Defendants. )
                )

Case No. 4-04 CV0000988 WRW

FILED UNDER SEAL
PURSUANT TO 31 U.S.C. § 3729, *et seq.*

FILED
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS
OCT 2 5 2006
JAMES W. McCORMACK, CLERK
By:
DEP CLERK

## THIRD AMENDED COMPLAINT FOR
## VIOLATIONS OF THE FALSE CLAIMS ACT

Plaintiff, United States of America, for claims against Defendants, complains and

alleges as follows:

## NATURE OF ACTION

1.  This is an action brought pursuant to the False Claims Act (31 U.S.C. § 3729, *et seq.*) through Norman Rille ("Rille") and Neal Roberts ("Roberts") as Relators ("Relator(s)"), pursuant to 31 U.S.C. § 3730(b), (the "FCA") for and on behalf of the United States of America. This action is brought against PricewaterhouseCoopers, LLP, PWC Consulting LLC, International Business Machines, Inc., Oracle Corporation, the Boeing Company,  Lockheed Martin Corporation, Raytheon Company,  Exostar, LLC, Exostar Corporation, and Cisco Systems, Inc., along with their various predecessors, successors, (collectively "Defendants"), by and through themselves, and/or their subsidiaries, and affiliates (directly or indirectly).

## United States Procurement of Products and Services from Defendants

2.  Over the last 10 years, the United States Government, along with its departments and subdivisions ("the United States Government" or "the Government"), is engaged in contracting for the development, manufacture and implementation of all kinds of programs and systems, including but not limited to substantial contracts to modernize and transform its operations.  Among other things, the United States Government has and does contract with United States Government contractors, including, but not limited to, general contractors and consulting companies, which purport to be skilled in contract execution, developing, manufacturing, and/or converting and integrating government systems and/or providing information technical services ("Systems Integration Consultants").  Such contracts, development, manufacture and/or conversion and implementation requires the Government's procurement of substantial technology hardware, software and technical services from various

2

technology companies ("Technology Vendors"); and, it has required the Government's expenditure of billions of dollars. Indeed, Government spending on information technology services and products alone constitutes as much as $150 billion annually, or 20 percent of combined commercial and Government information technology sales. Technology Vendors send tens of thousands of proposals to the Government yearly, seeking to capture some of these Government dollars. The Systems Integration Consultants, who are entrusted and retained to act as the Government's independent third party objective advisors, are to assist the Government in determining the most appropriate subcontractors, and hardware and software systems for many kinds of systems and programs including but not limited to  the integration of  computer systems and networks, all to meet the Government's ever growing needs.

3.  Contracts have been entered into between Defendants and the United States Government pursuant to the federal Anti-Kickback provisions set forth at 41 U.S.C. §51 *et seq.*, and the Federal Acquisition Regulations ("FARs"), including, but not limited to, FAR 3.502-3, 52.203-7, the federal Truth in Negotiations Act ("TINA") provisions set forth at 10 U.S.C. § 2306  *et seq.*, the federal Stark Law set forth at 41 U.S.C. §1395mm *et seq.*, and federal organizational conflict of interest laws, including, but not limited  to FAR 9.5  *et seq.* These laws and regulations, the False Claims Act, and the contracts themselves, all prohibit Kickbacks, as defined below, and require Defendants to be truthful in negotiations, and to certify that the cost or pricing data they proffer to the Government is current, accurate, and complete, and to certify that no third party relationship has been entered into that creates a conflict of interest with the Government.

## Defendants have Established Alliances
## to Capture United States Government Dollars

4.   In order to increase market share in Government work, Defendants, who are Government contractors, have established relationships, and routinely use those relationships, in what have become known as "teams," "strategic alliances," "alliance teams," or "affiliates" ("Alliance(s)" or "Alliance Team(s)" or "Alliance Partnership(s)" or "Affiliate(s)"). Defendants have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government. Defendants cooperate nearly exclusively with their Alliance Team members and/or Alliance Partners and/or Affiliates to this end.

## Defendants Have Entered into Conspiracies to Give and Receive Kickbacks
## and Concealed Them, and/or Misrepresented Best Pricing

5.   (a)  Plaintiff, the United States Government, alleges that over the last ten (10) years and continuing up to the date of trial (the "Relevant Time Period"), Defendants have exploited the trust the Government has reposed in them to act without conflicts of interest, and to serve as independent third party objective advisors, and have destroyed their independence by using their Alliance and/or Affiliate relationships to enrich themselves through a kickback scheme. For example, Defendants have entered into conspiracies between and among themselves wherein they seek/receive and/or offer/pay such Kickbacks, as defined below, between and among themselves in the nature of anything of value, including, but not limited to, referral fees, influence(r) fees, systems integration compensation fees, reseller fees, commissions, free or discounted products and/or services, equity ownership, profit sharing,  and/or profits to an entity partially owned by the Defendants, or other benefits ("Kickbacks" or "Kickback Scheme"). Such

4

Kickbacks are given to Defendants for their referral or recommendation to the Government of their Alliance Team members, Alliance Partners, and/or Affiliates, including, but not limited to, other Alliance Systems Integration Consultants, Alliance Technology Vendors, and/or any other Alliance and/or Affiliate contractors, in obtaining contracts or subcontracts with the United States.

(b)   These conspiratorial agreements to seek/receive and/or offer/pay such Kickbacks were and are a prerequisite to the inclusion of a Defendant in an Alliance Team or Alliance Partner or Affiliate relationship.  Also, in the furtherance of the Kickback Scheme and conspiracy, many of Defendants created partially or wholly-owned resellers of, among other things, Technology Vendor products and/or services ("Reseller(s)"), which such Defendants used to retain the Kickbacks, and/or used as conduits to funnel the Kickbacks to themselves.  The Defendants have agreed that their Kickback Scheme was and is to be kept confidential.  As a result, hundreds of millions of dollars of Kickbacks were sought, received, offered and paid between and among the Defendants with their Alliance Team Members and/or the Alliance Partners and/or Affiliates in violation of the False Claims Act and other federal statutes and regulations.  In furtherance of this Kickback Scheme and conspiracy, Defendants, and each of them, expressly or impliedly  represented or certified to the Government that they complied with various Anti-Kickback statutes, FARs, TINA, the Stark laws, and organizational conflict of interest laws, when, in fact, they had not, and do not, comply with such laws and regulations.  Again, this resulted in the making of false claims in breach of the FCA to the Government in connection with Defendants' Government contracts.

6.   Some of the Defendant Government contractors created a business to business

5

trading exchange(s) linking Government contractors, including but not limited to Systems

Integration Consultants and Technology Vendors, within the Aerospace and Defense industry.

This joint venture known as Exostar not only created and passed money or other things of value

to its joint venture owners, Alliances, and Affiliates, but it also became a conduit through which

it sought and/or received and/or offered and/or paid and/or passed Kickbacks, in its broadest

sense, to other Government contractors.

  7. In addition, as part of the schemes to defraud the Government and concealment,

Defendants failed to provide to GSA and other government agencies current, accurate, and

complete disclosure of their best pricing (after all discounts, rebates, and other benefits) for any

entities, whether such entity sells to the Government or not, all in violation of TINA and other

laws and regulations, thereby causing defective GSA and other government pricing schedules.

This resulted in FCA violations, as to both direct sales to the Government by a Defendant, and

indirect sales through an SI, Alliance, or Technology Vendor, with or without a Kickback.

## PARTIES, JURISDICTION AND VENUE

  8. PricewaterhouseCoopers, LLP,  is a Delaware Limited Liability

Partnership doing business in the State of Arkansas, and more particularly within the

geographical limits of the United States District Court, Central District, State of Arkansas.

During the Relevant Time Period, PWC, its predecessors, and successors (directly or through

subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance

Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United

States Government in various capacities, including but not limited to, as Systems Integration

Consultants for the United States Government, and/or Technology Vendors for the United States

Government.

9.  PWC Consulting LLC,  is a Delaware Limited Liability Company doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, PWC Consulting, its predecessors, and successors, including International Business Machines Inc. ("IBM") and IBM Global Services ("IBM Consulting") (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.   Defendants PriceWaterhouseCoopers, LLP, and PWC Consulting LLC, and their  predecessors, and successors (subsidiaries, affiliates or assigns) shall be referred to hereafter collectively as "PWC."

10. IBM is a New York corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas. During the Relevant Time Period, IBM, its predecessors, including PWC Consulting, and successors (directly or through subsidiaries, affiliates or assigns) have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

11. IBM Consulting is a New York corporation, and is a wholly owned subsidiary of

7

IBM, doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, IBM Consulting and its predecessors, including PWC Consulting and IBM, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

12. Oracle Corporation ("Oracle") is a Delaware corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Oracle, its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

13. The Boeing Company ("Boeing") is a Delaware corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Boeing, its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities,

including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

14.     Lockheed Martin Corporation ("Lockheed") is a Maryland corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Lockheed, its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

15.     Raytheon Company ("Raytheon") is a Delaware corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Raytheon, its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

16.     Exostar LLC is a Delaware Limited Liability Company, that was created by and through a joint venture between Boeing, Lockheed, and Raytheon, among others, who thereafter shared and currently share in the profits of Exostar LLC  (directly or through their subsidiaries, affiliates or assigns). Exostar LLC is and was doing business in the State of Arkansas, and more

9

particularly within the geographical limits of the United States District Court, Central District,

State of Arkansas. During the Relevant Time Period, Exostar LLC and its predecessors and

successors (directly or through subsidiaries, affiliates or assigns), including but not limited to

Exostar Corporation, have established Alliances, Alliance Teams, Alliance Partnerships, and/or

Affiliate relationships for the purpose of consummating sales to the United States Government in

various capacities, including but not limited to, as Systems Integration Consultants for the United

States Government, and/or Technology Vendors for the United States Government, and/or as

Resellers of Technology Vendor products and/or services, which Defendants, Government

contractors, Boeing, Lockheed, and Raytheon, used to seek/receive and/or offer/pay and/or retain

Kickbacks, including but not limited to income/profits/discounts/commissions/savings.

17. Exostar Corporation, is a Delaware corporation, that was created by and through a

joint venture between Boeing, Lockheed, and Raytheon, among others, who thereafter shared and

currently share in the profits of Exostar Corporation (directly or through their subsidiaries,

affiliates or assigns). Exostar Corporation is and was doing business in the State of Arkansas, and

more particularly within the geographical limits of the United States District Court, Central

District, State of Arkansas. During the Relevant Time Period, Exostar Corporation and its

predecessors and successors (directly or through subsidiaries, affiliates or assigns), including but

not limited to Exostar LLC, have established Alliances, Alliance Teams, Alliance Partnerships,

and/or Affiliate relationships for the purpose of consummating sales to the United States

Government in various capacities, including but not limited to, as Systems Integration

Consultants for the United States Government, and/or Technology Vendors for the United States

Government, and/or as Resellers of Technology Vendor products and/or services, which

10

Defendants, Government contractors, Boeing, Lockheed, and Raytheon, used to seek/receive and/or offer/pay and/or retain, Kickbacks, including but not limited to income/profits/discounts/commissions/savings.

18. Exostar LLC and Exostar Corporation shall hereinafter be referred to collectively as "Exostar." This joint venture known as Exostar not only created and passed money or other things of value to its joint venture owners, Alliances, and Affiliates, but it also became a "business to business trading exchange linking buyers with suppliers within the Aerospace and Defense industry," through which it sought and/or received and/or offered and/or paid and/or passed Kickbacks, in its broadest sense, to other Government contractors.

19. Cisco Systems, Inc. ("Cisco") is a California corporation doing business in the State of Arkansas, and more particularly within the geographical limits of the United States District Court, Central District, State of Arkansas.  During the Relevant Time Period, Cisco, its predecessors, and successors (directly or through subsidiaries, affiliates or assigns), have established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate relationships for the purpose of consummating sales to the United States Government in various capacities, including but not limited to, as Systems Integration Consultants for the United States Government, and/or Technology Vendors for the United States Government.

20. Jurisdiction of this Court is founded upon 28 U.S.C. § 1331, 28 U.S.C. § 1345, 31 U.S.C. § 3729 and 31 U.S.C. § 3732(a) inasmuch as the United States of America is a party hereto and the claims set forth herein are founded upon a law of the United States of America.

21. Venue lies in this District pursuant to 28 U.S.C. § 1391(b), 31 U.S.C. § 3729 and 31 U.S.C. § 3732(a) inasmuch as one or more of the Defendants can be found, resides and/or

transacts business within this district of the State of Arkansas; and more specifically, Defendants

transact business within this district of the State of Arkansas, and in addition, Defendants Cisco

and/or Oracle were and are Alliance Partner(s) or Alliance Teammate(s) and co-conspirator(s)

with Defendants PWC, and/or PWC Consulting, and/or IBM, and/or IBM Consulting, and/or

Boeing, and/or Lockheed, and/or Raytheon and/or Exostar in some of the acts alleged herein,

which were and caused the making of false claims under the FCA, and also by virtue of

violations of the Anti-Kickback statutes, FARs, TINA, the Stark laws, and organizational conflict

of interest laws, and/or that said conspiracy between Defendants was entered into within this

district of the State of Arkansas and/or acts pursuant to the conspiracy occurred from within this

district of the State of Arkansas, and/or false records/statements/certifications/claims were made

or caused to be made from within this district of the State of Arkansas, and/or Defendants

performed or are to perform contract work with the Government within this district, and/or were

paid from the Government or to the Defendants within this district of the State of Arkansas.

22. Relators have previously made a voluntary disclosure of the wrongdoing referred to

herein to the United States Government pursuant to U.S.C. § 3730(e)(4)(B).

## FACTUAL BACKGROUND

### Defendants' Kickback Scheme

23.     Plaintiff alleges that during the Relevant Time Period, Defendants Government

contractors established Alliances, Alliance Teams, Alliance Partnerships, and/or Affiliate

relationships, and some of Defendants established business to business trading exchange(s)

linking Government contractors, all for the purpose of consummating sales to the United States

Government with, among others, many of the major Government contractors, and most of the

following major sellers of hardware and software technology in the United States such as Acxiom Corporation ("Acxiom"), Avanade, Cisco Systems, Inc. ("Cisco"), Commerce One, Compaq Computer Corporation ("Compaq"), Dell Inc. ("Dell,"), EMC Corporation ("EMC"), Exostar, Hewlett-Packard Company ("HP"), IBM, Informatica Corporation ("Informatica"), J.D. Edwards & Company ("J.D. Edwards"), Manugistics Group, Inc. ("Manugistics"), Microsoft Corporation ("Microsoft"), NCR Corporation ("NCR"), Oracle Corporation ("Oracle"), PeopleSoft, Inc. ("PeopleSoft"), SAP Systems Integration AG ("SAP"), SeeBeyond Technology Corporation ("SeeBeyond"), Siebel Systems, Inc. ("Siebel"), Sun Microsystems, Inc. ("Sun Microsystems"), Unisys Corporation ("Unisys"), answerFriend, Asera, Inc. ("Asera"), BEA Systems, Inc. ("BEA Systems"), Blue Martini Software, Inc. ("Blue Martini"), Broadvision, Inc. ("Broadvision"), Cognos, Incorporated ("Cognos"), Jamcracker, Inc. ("Jamcracker"), Kalido Ltd. ("Kalido"), Kana Software, Inc. ("Kana"), Plumtree Software, Inc. ("Plumtree") SAS, Seisint, Inc. ("Seisint"), Teradata, Top Tier Software, Inc. ("Top Tier") and Vignette Corporation ("Vignette"), and their affiliates, predecessors, successors in interest, and subsidiaries. Also, Defendants, and/or their Alliance Team members, and/or Affiliates, entered into contracts with the United States Government, under the terms of which, and/or by virtue of law or regulation requiring them to comply with the False Claims Act, Anti-Kickback statutes, FARs, TINA, the Stark laws, and organizational conflict of interest laws.

24. During the Relevant Time Period, Defendants, and each of them, in violation of their contracts with the United States Government, established Alliance relationships, and/or Affiliate relationships wherein Kickbacks were sought, received, offered and/or paid between and among them for referring, recommending, and/or assisting their Alliance Team members,

and/or Alliance Partners, and/or Affiliates in obtaining contracts and/or subcontracts with the United States Government.

25. Defendants had and have actual knowledge that their representations, negotiations, statements, records, claims, invoices for payment and certification of compliance (express or implied) with the Anti-Kickback statutes, FARs, TINA, the Stark laws, and organizational conflict of interest laws, were false, and/or acted in reckless disregard for their truth, or acted with deliberate ignorance of their falsity.

26. Defendants, directly or indirectly, submitted false claims for payment to the United States Government and expressly or impliedly made statements, records and certifications of compliance in support of such claims, and in violation of the FCA, and also in violation of the Anti-Kickback statutes, FARs, TINA, the Stark laws, and organizational conflict of interest laws.

## **RELATOR RILLE'S DIRECT AND INDEPENDENT KNOWLEDGE**

27. Based on the following experiences, communications and documents seen during his employment at NCR and Accenture, Relator Rille learned that the Alliance Technology Vendors' relationship with Systems Integration Consultants meant that, as a policy and practice, Kickbacks were sought, received, offered and/or paid between the Systems Integration Consultants and their Alliance Technology Vendors. He further learned that Alliance relationships meant that as a policy and practice, Kickbacks were sought, received, offered and/or paid between United States Government contractors by and between their Alliance Team Members and/or Alliance Partners. These Kickbacks included "referral fees," "influence(r) fees," "systems integration compensation fees," "reseller fees," commissions, free or discounted products and/or services, equity ownership, profit sharing, payment of all or a portion of an

14

employee's salary and/or benefits, rebates, training, joint marketing budgets, payment of or credit for all or a portion of any of expenses, and any other things or services of value. For example, these Kickbacks were and are being paid to Accenture for referring, or recommending, and/or for assisting Alliances and/or Affiliates in obtaining contracts or subcontracts with the United States. Furthermore, Relator Rille learned that NCR and SeeBeyond had and have a policy and practice of giving Kickbacks to their Alliance Team members, and/or Alliance Partners and/or Affiliates.

28. Also, Relator Rille learned during his employment with NCR and Accenture that such monies or other things of value, including but not limited to, equity ownership, fees, and the receipt and payment of such fees, which were the subject of the Kickback Practice, were always to be kept confidential, and never to be disclosed to customers. This means that, for example, Defendants also failed to provide to GSA and other government agencies current, accurate, and complete disclosure of their best pricing (after all discounts, rebates, and other benefits) for any entities, whether such entity sells to the Government or not, all in violation of TINA and other laws and regulations, thereby causing defective GSA and other government pricing schedules. Likewise, Relator Rille learned during his employment with NCR and Accenture that the Alliance and/or Affiliate relationships of Accenture (which implemented the Kickback Practice) included most of the major sellers of hardware and software in the United States along with Avanade, Cisco, Commerce One, Compaq, EMC, HP, IBM, Informatica, J.D. Edwards, Manugistics, Microsoft, NCR, Oracle, PeopleSoft, SAP, SAS, SeeBeyond, Seibel, Sun Microsystems, Unisys, answerFriend, Asera, BEA Systems, Blue Martini, Broadvision, Cognos, Jamcracker, Kalido, Kana, Plumtree, Seisint, Sun Microsystems, Teradata, Top Tier and Vignette and their affiliates, predecessors, and successors in interest. Based on the documents received

and the statements made to Relator Rille, he has concluded that Alliance/Affiliate relationships meant that most of the United States Government contractors, including, but not limited to, all the major Systems Integration Consultants and Technology Vendors, were and are engaged in the same Kickback Scheme and associated conspiracies.

29. In approximately 1991, Norman Rille started working as a Director of Product Support for Teradata Corporation, which was subsequently acquired by NCR. Over the following years he progressed to the position of Senior Product Manager. In approximately 1996, Lars Nyberg took over as Chief Executive Officer at NCR, and advised the NCR personnel, including Relator Rille, that NCR was going to change their marketing strategy to aggressively "go to market through Alliance Partners," who were Systems Integration Consultants, and that they were going to create Alliance relationships with all the major Systems Integration Consultants. Mark Herd, VP of Marketing, and Dale Hazel, Relator Rille's superior, also repeated those same messages in various group NCR meetings that Relator Norman Rille attended. As Relator Rille was about to leave NCR for Coopers & Lybrand, John Catozzi, Lead Architect for Teradata database software at NCR, told Relator Rille that because NCR was establishing Alliances with all of the major Systems Integration Consultants, including Accenture, Relator Rille's knowledge of the Teradata products would put him in good stead not only with Coopers & Lybrand, but also with all the other large Systems Integration Consultants. When Relator Rille left NCR in 1998, he did not understand at that time that an Alliance relationship would include the payment of "referral fees," "influencer fees," "SI Comp fees," or "reseller fees." Such an understanding would later follow.

30. After employment at Coopers & Lybrand, which became PricewaterhouseCoopers,

Relator Rille began employment in late 2000 at Andersen Consulting LLP, which soon thereafter became Accenture, as a Senior Manager in the Information Delivery Architecture group, with special focus on data warehousing and business intelligence technologies. While working for Accenture, Relator Rille was advised that it was Accenture's policy and practice to seek and obtain "referral fees," "influencer fees," "SI Comp fees," or "reseller fees" in the form of monies, commissions, free or discounted products or other things or services of value for referring, recommending or assisting Accenture's Alliance Technology Vendors in obtaining contracts or subcontracts with the United States. He learned this when he asked the Alliance Services Manager, Mark Barry, the following: "Mark, can you tell me why these phone contacts are required? Who is it helping?" Mark Barry replied that, among other things, it was to improve the "job economics" for Accenture, thereby affirming the Kickback Scheme. See a copy of Mark Barry's e-mail confirming this which is attached as Exhibit "A."

31. While working for Accenture, Relator Rille was involved in a job with A.G. Edwards, wherein he learned more about the extent of Accenture's Alliance relationships. He was told by Mark Barry, Alliance Services Manager, and Jeff Gans, Manager of Engagement Economics for Accenture on the A.G. Edwards job, that Accenture's Alliance relationships included virtually all of the major sellers of hardware and software in the United States.

32. While still at Accenture, Relator Rille received copies of documents, which confirm that Accenture had established Alliance and/or Affiliate relationships with many of the hardware and software vendors. Relevant portions of some of the Accenture documentation and Technology Vendor documentation on this subject are attached as Exhibits "B"and "C." They list as Accenture Alliance/Affiliate partners among others: Avanade, Cisco, Cognos, Commerce

One, Compaq, EMC, HP, IBM, Informatica, J.D. Edwards, Manugistics, Microsoft, NCR,

Oracle, PeopleSoft, SAP, SAS, Seibel, SeeBeyond, Sun Microsystems, answerFriend, Asera,

BEA Systems, Blue Martini, Broadvision, Cognos, Jamcracker, Kalido, Kana, Plumtree, Seisint,

Teradata, Top Tier and Vignette.

    33. During his Accenture employment, Relator Rille also received a copy of an

Accenture-NCR document entitled "Master Reseller Agreement" between NCR as the vendor

and Accenture and Proquire jointly as a Reseller.  It also includes a Referral Form and express

provisions for payment of referral fees to Accenture by NCR, confirming the existence of both

the Kickback Scheme and its accompanying conspiracies.  The Referral Form provides in

relevant part:

### "__Master Reseller Agreement__

**THIS MASTER RESELLER AGREEMENT**, effective as of April 13, 2001 (the "Effective Date"), is made and entered into by and between:

**ACCENTURE LLP**, an Illinois limited liability partnership ("Accenture"), and Proquire LLC, a Delaware limited liability company ("Proquire"), each having an office at 100 South Wacker Drive, Chicago, Illinois 60606, (Accenture and Proquire are individually and collectively referred to herein as "Reseller" and "you") and

**NCR Corporation**, a corporation organized and existing under the laws of the State of Maryland, USA, with its principal offices at 1700 South Patterson Blvd., Dayton, Ohio USA ("NCR").

**PURPOSE**
The purpose of this Agreement is to document the understanding between NCR and you with respect to: . . .

• NCR's and your role in referring, selling and delivery of support Service . . . ."

". . . If NCR is the Referred Party and if this Referral Form is accepted by NCR, NCR agrees to pay you the following referral fee in accordance with the Joint Referral

Agreement:

If you are the Referred Party and if this Referral Form is accepted by you, you agree to pay NCR the referral fee specified in the Joint Referral Agreement. . . ."

A copy of the most pertinent parts of this documentation is attached as Exhibit "D."

34. Relator Rille was also sent an e-mail confirming that NCR had paid, for one calendar year alone, referral fees or reseller fees to Accenture of "around $750,000" in connection with their Alliance relationship, and for referring Accenture's consulting clients to NCR for hardware/software sales.   See a copy of said e-mail attached as Exhibit "E."  This e-mail also outlines the referral/reseller fee arrangements and software discounts available to NCR's Alliance partners as follows:

"Reseller Agreement   20-30%

SI Compensation Agreement         up to 8% SI Compensation for new footprints, and, up to 5% for repeat customers

Professional Services Subcontracting      Case by case"

35. While still working for Accenture, Relator Rille again spoke with Jeff Gans, Manager of Engagement Economics for Accenture on the A.G. Edwards job, about NCR's involvement in the A.G. Edwards engagement.  At that time, Jeff Gans identified the Alliance channel as an important source of enhancement of Accenture's revenues on the A.G. Edwards engagement.

36. Kevin Messer, Accenture's Senior Manager in Government Services, the division that focuses on contracts with the Government, asked Relator Rille to draft a presentation, describing NCR's Teradata product, and its application in the business intelligence field for

Government projects. This presentation included a section that outlined the NCR-Accenture Alliance terms, and was entitled: "Teradata and Accenture: The Business Partnership." A copy of relevant portions of this document is attached as Exhibit "F." Before being confidentially distributed internally, this document was reviewed and approved by Kevin Messer, and Nancy Mullen, who was an Accenture Associate Partner and also Accenture's Lead for Capability Development, among other titles. A similar document, authored by Accenture personnel, approved by Nancy Mullen, and received by Relator Rille, is entitled "NCR Teradata-Accenture Alliance Credentials Deck 12/5/2001." Key and relevant portions of this document are attached as Exhibit "G" and include in part as follows:

> " . . . **NCR & Accenture - Agreement Points**
>
> - **Resale Discounts:**
>   - 20-30% on licenses from list price
> - **Service Integrator Compensation (SI Comp):**
>   - **Up to 8% SI Comp (Systems Integrator Compensation)** for new footprints and up to 5% for repeat customers . . ."

37. On approximately March 27, 2001, while still employed at Accenture, Relator Rille received a document from NCR entitled "Partner Update," which is attached as Exhibit "H." This document identifies some of the NCR partners, known as "Team Teradata Members" as follows: Accenture, Cap Gemini Ernst & Young ("CGE&Y"), Deloitte, EDS, Hitachi, and iMC, among others.

38. Additionally, while at Accenture, Relator Rille received a document from SeeBeyond, which was owned in part by Accenture, describing Accenture's Alliance/Affiliate

relationship with SeeBeyond. This SeeBeyond document, which is attached in part as Exhibit "I," confirms that Accenture seeks and receives, and SeeBeyond, pays, "referral fees," "reseller fees," provides discounted or free training, software and installation to its Alliance Partners/Affiliates. This document also specifies the terms of the Kickback Scheme with Accenture as follows:

"...  <u>**Our Business Relationship**</u>

- ■ **Equity Position – 3%**

- ■ **SeeBeyond Board Seat – Jack Wilson, Accenture Partner**

- ■ **Strategic eAI Alliance**

- ■ **Incentive Program**

  - Up to 15% paid to engagement ream where SeeBeyond is part of the solution

- ■ **Global Marketing Agreement**

  - Referral Agreement – 10%

  - Reseller Agreement – 20%

  - Discounted Training FY '01 for e*Gate; Free for e*Xchange

  - Accenture Trained 300 in 2000.  Plan for 2001 is 600.

- ■ **Solution Center Enablement**

  - Free software and installation . . ."

This SeeBeyond document also identifies other companies likely involved in the Kickback Scheme and associated conspiracies including, but not limited to, Accenture, Booz-Allen Hamilton, Calico, Cap Gemini Ernst & Young, Clarify, Computer Sciences Corporation, Control, DataChannel, EDS, Firepond, i2 Technologies, NetVendor, Oracle, PeopleSoft, Perot

Systems, PricewaterhouseCoopers, Propelis, Remedy Corporation, SAP, SeeBeyond, Sequoia

Software, Siebel, Swift Ready Gold Middleware, Vignette, and Wavbond.

39. Relator Rille learned that Accenture and its Alliances/Affiliates have been including

their Alliances/Affiliates in contracts with the United States Government through various

communications and documents he received while at Accenture. In addition to that already

stated and cited above, for example:

- Exhibit "C," includes Accenture "Data Warehouse Practice" presentation pages 1-2 and Accenture "Security point of View" slide presentation, slides 1, 6 and 49, which both describe the Alliance relationships between Accenture, SAS, Cisco, Sun Microsystems, HP, Oracle and others, and work to be performed by Accenture, its Alliances and/or Affiliates for the United States Government, among other work.

- Exhibit "I," numbered page 8 identifies the federal Defense Logistics Agency ("DLA") and federal State Department as joint clients of Accenture and SeeBeyond.

- Exhibit "J," entitled "Response for: United States Transportation Command (USTRANSCOM)" dated July 18, 2001, page 5, represents that Accenture has "15 subcontractors and 3 Alliance partners integrated into a cross-functional team" for this Government project.

- The second to the last page of Exhibit "E," identified above is an e-mail from Viney K. Kaushal, Accenture Global Alliance Manager, regarding the "significant activities with regard to the NCR Teradata Alliance relationship" with Accenture. It identifies "CURRENT & RECENT CLIENTS ENGAGEMENTS (Joint Wins)" for the Accenture NCR Alliance, expressly references federal Government contracts for "US Postal Service, Air Force Test & Development, NAVAIR, FAA, US Air Force EDW (Just Revived) and US Air Force First."

- The last page of Exhibit "E" states that the amount of the Accenture Resale/SI Comp Revenue [Kickback] from NCR on the US Postal Service contract is To Be Decided; "TBD (Recently Awarded)." Other entries on this same page confirm that approximately $1.2 million was received by Accenture as Resale/SI Compensation Revenue [Kickback] during the year 2000-2001.

- Exhibit "K" is an Accenture document summarizing the involvement of Accenture and its Alliances Team on the business systems modernization engagement for the federal Government's Defense Logistics Agency. Among others, the document

identifies Alliance companies as follows: "SAP, Manugistics, and Unisys." Additionally, Exhibit "J" describes the subcontractors and Technology Vendors as part of Accenture's "cross-functional team."

- Exhibit "L," attached and entitled "Oracle S/W Pricing for GTN21" is an Accenture internal worksheet prepared in support of Accenture's proposal for work on the federal project entitled Global Transportation Network for the 21st Century. Significantly, it shows a deeper discount from Oracle to Accenture than to the federal Government on this federal contract.

- Exhibit "M," attached and entitled "Resume Michael E VanVooren" is a description of Accenture's Teamwork with Exostar-a joint venture between The Boeing Company, Lockheed Martin Corporation, Raytheon Corporation, and others. It describes this joint venture as a "business to business trading exchange linking buyers with suppliers within the Aerospace and Defense industry." It also indicates that Accenture is a Teammate coordinating the Accenture-Exostar Team and that they also "worked with other team members to support the on-ramps of the four founding company partners..." Relator Rille understood that the term "on-ramp" is a term of art for Alliances in the Government contractor industry.

## RELATOR ROBERT'S DIRECT AND INDIRECT KNOWLEDGE

## OF THE KICKBACK SCHEME

40. Relator Roberts, a prior partner with Deloitte, and Coopers & Lybrand, which became PricewaterhouseCoopers, has investigated Alliance/Affiliate relationships, including, but not limited to, the conduct of Systems Integration Consultants and Technology Vendors in Alliance/Affiliate relationships. As part of his investigation, he has spoken to various retired and current partners of Government contractors, also including partners with his prior firms. In the process, he learned that the Alliance/Affiliate relationships between Government contractors meant that it is a practice to seek and receive, and/or pay, Kickbacks to the Alliance partners and/or Affiliates as part of the Kickback Scheme and conspiracy alleged herein.

41. He learned that these Kickbacks were "referral fees," "influencer fees," "SI Comp fees," or "reseller fees" in the form of monies, commissions, free or discounted products

23

or other things or services of value that were and are being paid to Government contractors for referring, or recommending, and/or assisting their Alliance Team Members and/or Alliance Partners in obtaining contracts and/or subcontracts with the United States Government. Attached hereto as Exhibit "N" is a list of some of the Government contractors that engaged in the Kickback Scheme known to Relator Roberts.

42. Relator Roberts further learned that it was the policy and practice of Government contractors in Alliance/Affiliate relationships not to disclose the Kickbacks by and between their Alliance Team Members and/or Alliance Partners and/or Affiliates to their customers.

## SUMMARY OF FALSE CLAIMS ACT VIOLATIONS

43. During the Relevant Time Period and as described herein above, Defendants along with their various predecessors, successors, by and through themselves, and/or their subsidiaries, and affiliates (directly or indirectly), including, but not limited to, those identified in Exhibit "O" attached hereto and incorporated herein, engaged in and continue to engage in the following systemic wrongful conduct in violation of the FCA:

a.   Presenting, or causing to be presented, false claims for payment to the United States Government for Government contract work, which involved referring, recommending, and/or the assisting of any Alliance Partner and/or Alliance Team Member and/or Affiliate, of PWC, and/or PWC Consulting, and/or IBM, and/or IBM Consulting, and/or Oracle, and/or Boeing, and/or Lockheed, and/or Raytheon, and/or Cisco, and/or Exostar, and/or any Government contractor working with and/or through Exostar, in obtaining contracts and/or subcontracts with the United States Government, and any of the Alliances/Affiliates of the foregoing and/or seeking/receiving and/or offering/paying Kickbacks pursuant to the conspiracies and Kickback Scheme as alleged

24

herein.

a.   Presenting, or causing to be presented, false claims for payment to the United States Government for Government contract work, which involved referring, recommending, and/or the assisting of any Alliance Partner and/or Alliance Team Member and/or Affiliate, of PWC, and/or PWC Consulting, and/or IBM, and/or IBM Consulting, and/or Oracle, and/or Boeing, and/or Lockheed, and/or Raytheon, and/or Cisco, and/or Exostar in obtaining contracts and/or subcontracts with the United States Government. This also involved Exostar retaining/passing money or other things of value to Defendants Boeing, Lockheed, and Raytheon, as its joint venture owners, to Alliances, and Affiliates, and also serving as a conduit through which other Government contractors sought/ received and/or offered/paid Kickbacks, including but not limited to, income/profits/discounts/commissions/savings.

b.   Making, using, or causing to be made, or causing to be used, false records and/or statements to the United States Government to obtain United States Government contracts, and/or for support of claims for payment, and/or indicating that PWC, and/or PWC Consulting, and/or IBM, and/or IBM Consulting, and/or Oracle, and/or Boeing, and/or Lockheed, and/or Raytheon, and/or Cisco and/or Exostar in obtaining contracts and/or subcontracts with the United States Government. This also involved Exostar making, using, or causing to be made, or causing to be used, false records and/or statements to facilitate retaining/passing money or other things of value to Defendants Boeing, Lockheed, and Raytheon, as its joint venture owners, to Alliances, and Affiliates, and/or funneling Kicbacks for other Government contractors, including but not limited to, income/profits/discounts/commissions/savings.  As part of the schemes to defraud the Government, Defendants have also been failing to provide to GSA and other government

25

agencies current, accurate, and complete disclosure of their best pricing (after all discounts,

rebates, and other benefits) for any entities, whether such entity sells to the Government or not,

all in violation of TINA and other laws and regulations, thereby causing defective GSA and other

government pricing schedules.  This resulted in FCA violations, as to both direct sales to the

Government by a Defendant, and indirect sales through an SI, Alliance, or Technology Vendor,

with or without a Kickback.

      c.   Presenting, certifying (expressly or impliedly) claims for payment and/or making,

using, or causing to be made or used, false records and/or statements to the Government

supporting claims for payment to the United States Government under United States Government

contracts/subcontracts provided in a manner that violates the Federal Anti-Kickback provisions

set forth at 41 U.S.C. §51 *et seq.*, and the FARs, including, but not limited to, FAR 3.502-3,

52.203-7, the provisions of TINA set forth at 10 U.S.C. § 2306  *et seq.*, the Federal Stark Law set

forth at 41 U.S.C. §1395mm *et seq.*, and organizational conflict of interest laws, including, but

not limited  to FAR 9.5  *et seq.*

      d.   Defendants PWC, and/or PWC Consulting, and/or IBM, and/or IBM Consulting,

and/or Oracle, and/or Boeing, and/or Lockheed, and/or Raytheon, and/or Cisco, and/or Exostar,

and their predecessors, successors, Affiliates, and subsidiaries entering into a conspiracy to

defraud the Government by getting contracts/subcontracts awarded to them and/or any other

Alliance Team member, and/or Alliance Partner, and/or Affiliate, and/or any other Government

contractors working with and/or through Exostar, and/or to get false or fraudulent claims allowed

or paid, all in a manner that violates 31 U.S.C. §3729(a)(3) and Federal Anti-Kickback

provisions set forth at 41 U.S.C. §51 *et seq.*, and the FARs, including, but not limited to, FAR

3.502-3, 52.203-7, the provisions of TINA set forth at 10 U.S.C. § 2306.

44. It is alleged that the foregoing practices have resulted in the United States Government, either directly or indirectly through its agencies or intermediaries, entering into contracts/subcontracts under false representations and violations of law as alleged herein, purchasing the wrong products, including but not limited to, Alliance and/or Affiliate products, and/or technical services, and/or paying out monies or excess monies to Defendants, to which Defendants are not entitled, all in violation of the FCA.

45. It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have contracted with Defendants had it known that the contracts/subcontracts, products and/or services for which the contracts were proposed were subject to a scheme to violate the violates the Federal Anti-Kickback provisions set forth at 41 U.S.C. §51 *et seq.*, and the FARs, including, but not limited to, FAR 3.502-3, 52.203-7, the provisions of TINA set forth at 10 U.S.C. § 2306 *et seq.*, the Federal Stark Law set forth at 41 U.S.C. §1395mm *et seq.*, and organizational conflict of interest laws, including, but not limited to FAR 9.5 *et seq.*

46. It is further alleged that the United States Government, either directly or indirectly through its agencies or intermediaries, would not have honored Defendants' claims for payment, had it known that the contracts/subcontracts, products and/or services for which the claims were made, were provided in a manner that violates the Federal Anti-Kickback provisions set forth at 41 U.S.C. §51 *et seq.*, and the FARs, including, but not limited to, FAR 3.502-3, 52.203-7, the Federal TINA provisions set forth at 10 U.S.C. § 2306 *et seq.*, the Federal Stark Law set forth at 41 U.S.C. §1395mm *et seq.*, and organizational conflict of interest laws, including, but not

limited to FAR 9.5 *et seq.*

## COUNT ONE

## SUBSTANTIVE VIOLATIONS OF THE FALSE CLAIMS ACT

47. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 46 above, as if fully set forth herein.

48. Accordingly, Defendants have violated the provisions of the False Claims Act, 31 U.S.C. § 3729(a) by:

a. Knowingly presenting or causing to be presented to the United States Government, directly or indirectly, false or fraudulent claims to be paid or approved, directly or indirectly, by the United States Government (31 U.S.C. § 3729(a)(1));

b. Knowingly making, using, or causing to be made or used, misrepresents false records or statements and/or false certifications to obtain contracts/subcontracts and/or the payment of false or fraudulent claims to be paid or approved by the United States Government (31 U.S.C. § 3729(a)(2));

49. The United States Government, upon presentation of such claims for payment, whether directly or indirectly, remitted payment despite the false nature of such claims.

50. Pursuant to 31 U.S.C. § 3729(a), Defendants are liable to the United States Government for a civil penalty of not less than $5,500, and not more than $11,000 for each violation of the FCA committed by Defendants.

51. The United States Government has further sustained damages, and will yet sustain damages up to the date of trial in an amount yet to be determined. Pursuant to 31 U.S.C. § 3729(a) Defendants are liable for three times the amount of all such damages sustained by the

United States Government.

## COUNT TWO

### FALSE CLAIMS ACT CONSPIRACY

52. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 51 above, as if fully set forth herein.

53. Pursuant to 31 U.S.C. § 3729(a)(3) through the acts described above and otherwise, Defendants entered into a conspiracy or conspiracies among themselves and with others to defraud the United States to obtain the above-alleged contracts and/or subcontracts and to get false and fraudulent claims allowed or paid. Defendants have also conspired to omit disclosing or to actively conceal the Kickback Scheme, and the business to business exchange with associated Kickbacks, which, if known, would have reduced Government obligations to them or resulted in repayments from them to Government programs. Defendants have taken substantial steps in furtherance of those conspiracies, by, among other things, preparing false records, by submitting such records to the Government for payment or approval, and by directing their agents, consultants, and personnel not to disclose and/or to conceal Defendants' fraudulent practices.

54. The United States Government, through its intermediaries, is unaware of Defendants' conspiracies or the falsity of the records, statements and claims made by Defendants, and their agents, employees and co-conspirators, and as a result thereof, have paid and continue to pay millions of dollars to Defendants that they would not otherwise have paid.

55. By reason of Defendants' conspiracies and the acts taken in furtherance thereof, the United States Government, and its intermediaries, have been damaged in the amount of many

millions of dollars.

## PRAYER

WHEREFORE, Plaintiff, United States Government, prays for judgment against Defendants for:

1.   A judgment against all Defendants for all losses and damages that have been, or will be, sustained by the United States Government during the Relevant Time Period as a result of their violations of the FCA, as alleged herein, and triple the amount of such damages and for forfeiture of all revenues paid by the United States Government to Defendants under the contracts acquired in violation of the FCA pursuant to 31 U.S.C. § 3729; and civil penalties of not less than $5,500, nor more than $11,000, for each and every such violation;

2.   Declaratory judgment that the herein-described false claims, false records and statements and conspiracy by and among the Defendants are in violation of the FCA;

3.   An injunction against all Defendants that they not engage in further false claims, use of false records and statements and conspiracy with respect to consulting and software/hardware services/products as described herein;

4.   Reasonable attorney's fees;

5.   Costs incurred in the prosecution hereof; and

6.   Such other relief as the Court deems just and equitable.

Attorneys for Relator/Plaintiff

WILSON, ENGSTROM, CORUM & COULTER
200 South Commerce, Suite 600
Post Office Box 71
Little Rock, AR 72203
Telephone: (501) 375-6453

Facsimile: (501) 375-5914

Dated: __10-25-06__                   By: _____
                                           Stephen Engstrom

Von G. Packard (CA74877)              Craig H. Johnson (CA90539)
Ronald D. Packard (CA 72173)          PACKARD, PACKARD & JOHNSON
PACKARD, PACKARD & JOHNSON            2795 Cottonwood Parkway, Suite 600
Four Main Street, Suite 200           Salt Lake City, Utah 84121
Los Altos, California 94022           Telephone: (801) 428-9000
Telephone: (650) 947-7300             Facsimile: (801) 428-9090
Facsimile: (650) 947-7301